890 P.2d 673

**STATE of Hawai'i, Respondent–Appellee,**

v.

**Aaron R. BOLOSAN, Petitioner– Appellant.**

**No. 15993.**

Supreme Court of Hawai'i.

March 7, 1995.

Deborah L. Kim, Deputy Public Defender, on the briefs, Honolulu, for petitioner-appellant.

Lisa M. Itomura, Deputy Pros. Atty., on the briefs, Honolulu, for respondent-appellee.

Before MOON, C.J., KLEIN, NAKAYAMA, and RAMIL, JJ., and SHIMABUKURO, Circuit Court Judge, in place of LEVINSON, J., recused.

KLEIN, Justice.

Petitioner–Appellant Aaron R. Bolosan was convicted of two drug-related offenses, promoting a dangerous drug in the third degree in violation of Hawai'i Revised Statutes (HRS) § 712–1243 (1985), and unlawful use of drug paraphernalia in violation of HRS § 329–43.5(a) (Supp.1992), and two traffic offenses, driving without a license in violation of HRS § 286–102 (Supp.1992), and driving without no-fault insurance in violation of HRS § 431:10C–104 (Spec.Pamphlet 1987 & Supp.1992). The Intermediate Court of Appeals (ICA) in a published opinion reversed Bolosan's convictions of the drug-related offenses, affirmed his driving without a license

conviction, and vacated and remanded for a new trial on the driving without no-fault insurance charge. *State v. Bolosan*, 78 Hawai'i 98, 890 P.2d 685 (App.1994), *cert. granted*, 76 Hawai'i 453, 879 P.2d 558 (1994).

We granted Bolosan's timely application for writ of certiorari to review the ICA's decision, and now affirm in part, reverse in part, and remand for further proceedings.

## I.  *BACKGROUND*

This case arose out of an incident that occurred on March 3, 1989 in Honolulu. At about 11:20 p.m. that night, Honolulu Police Officer Gerry Asato noticed the car that Bolosan was driving stopped at a red light at an intersection 75 to 100 feet away. He heard the engine revving loudly and saw a plume of heavy exhaust. When the light turned green, Bolosan drove through the intersection toward Officer Asato's position. Bolosan did not screech the tires and did not travel at a high speed. Officer Asato did not notice any other cars near Bolosan's car and, when he testified at the motion to suppress, he could not remember if there had been other people on the street or sidewalk, or in the neighborhood.

Based on these observations, Officer Asato believed that Bolosan may have committed the offense of Exhibition of Speed in violation of HRS § 291C–103 (1985).[1] He therefore stopped Bolosan's vehicle. During the course of the stop, Officer Asato discovered that Bolosan did not have a driver's license or a no-fault insurance card, and was carrying a bong (a glass pipe used to smoke drugs) and an envelope containing crystal methamphetamine.[2]

1.  HRS § 291C–103 (1985) provided in pertinent part:

> **Racing on highways.** (a) Except as provided in section 291C–149 [ (Bicycle racing) ], no person shall drive any vehicle in any race, speed competition or contest, drag race or acceleration contest, test of physical endurance, exhibition of speed or acceleration, or for the purpose of making a speed record, and no person shall in any manner participate in any

> such race, competition, contest, test, or exhibition.

Subsequent to Bolosan's arrest, the statute was amended to define "exhibition of speed or acceleration." *See* HRS § 291C–103 (Supp.1992).

2.  More details regarding the manner in which the evidence was discovered are set forth in the opinion of the ICA. *Bolosan*, 78 Hawai'i at 101, 890 P.2d at 688. Those details, however, are not relevant to our discussion.

Bolosan was then arrested and subsequently indicted for promoting a dangerous drug in the third degree, unlawful use of drug paraphernalia, driving without a license, and driving without no-fault insurance. At trial, in addition to the evidence obtained at the time of the stop, it was stipulated that the vehicle Bolosan was driving belonged to a friend of his and that neither Bolosan nor the car's owner had a no-fault policy covering Bolosan's operation of the car. Furthermore, according to Bolosan's uncontroverted testimony, Bolosan had not asked his friend whether the car was insured but had assumed that it was insured because he had seen his friend driving the car for several months prior to the date of arrest. Bolosan was subsequently convicted of all charges and sentenced accordingly.

On appeal, the ICA concluded that Officer Asato did not have reasonable grounds to believe that Bolosan may have violated HRS § 291C–103. Nonetheless, the ICA held that the stop was justified because "the specific and articulable facts in this case, viewed objectively, would warrant a person of reasonable caution to believe that [Bolosan] had violated 1990 Revised Ordinances of Honolulu (ROH) § 15–19.28[3] [(the muffler ordinance)]...." *Bolosan*, 78 Hawai'i at 103, 890 P.2d at 690. The ICA went on, however, to reverse the convictions of the drug-related offenses on the ground that the evidence in support of those convictions should have been suppressed because it was obtained only after Officer Asato unconstitutionally ordered Bolosan to exit the car and conducted a pat-down search of his person. *Id.* at 105, 890 P.2d at 692. Finally, although rejecting Bolosan's argument that the trial court misapplied the "lack of knowledge de-

fense" to the driving without no-fault insurance charge, the ICA vacated the conviction thereof and remanded for a new trial because the trial court had applied the wrong state of mind requirement for that offense. *Id.* at 107, 890 P.2d at 694.

## II. *DISCUSSION*

### A. *Scope of Review*

Appeals from decisions of the ICA are governed by HRS § 602–59 (1985), which provides in part:

(a) After issuance of a decision by the [ICA], a party may appeal such decision only by application to the supreme court for a writ of certiorari, the acceptance or rejection of which shall be discretionary upon the supreme court.

(b) The application for writ of certiorari shall tersely state its grounds which must include (1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the [ICA] with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors dictating the need for further appeal.

In the instant case, the only grounds stated in Bolosan's application for a writ of certiorari concerned the ICA's conclusion that the initial stop was justified. Bolosan did not contest the ICA's rejection of his argument that the trial court misapplied the "lack of knowledge defense" to the driving without no-fault insurance charge. In addition, the State failed to file a timely application for a writ of certiorari [4] challenging any of the ICA's rulings adverse to it, such as the holding that the exit order and pat-down search

---

3. ROH § 15–19.28 provides in pertinent part:

   **Mufflers—Noise-controlling devices.**

   (a) No person shall operate a motor vehicle on a public highway or street unless such motor vehicle is equipped, at all times, with a muffler or mufflers in constant operation and of such length and size or of sufficient capacity for the motor and/or exhaust system to prevent the escape of excessive or annoying fumes or smoke, and excessive or unusual noise. The term "excessive or unusual noise," as used in this section, means noise in excess of the usual noise which would necessarily result from the operation of a

motor when reduced to the minimum by a muffler such as defined herein.

   (b) No person shall operate a motor vehicle on a public highway or street unless the motor and/or exhaust system of such motor vehicle is properly equipped and adjusted so as to prevent the escape of excessive or annoying fumes or smoke and the emission of excessive or unusual noise as defined herein.

4. The State had submitted an application for a writ of certiorari, but it was rejected as untimely because it was filed beyond the ten day period required by HRS § 602–59(c).

violated article I, section 7 of the Hawai'i Constitution.

■ Despite the limited number of issues raised in Bolosan's application for a writ of certiorari, the legislative history of HRS § 602–59 makes clear that we have the authority to consider any issues that arise in this case.[5] On the other hand, when a party fails to properly challenge a ruling of the ICA, we ordinarily will not address that ruling absent plain error. *See State v. Elliott*, 77 Hawai'i 309, 310 n. 1, 884 P.2d 372, 373 n. 1 (1994) ("Because the State did not apply for a writ of certiorari to review the ICA's decision regarding the disorderly conduct conviction, and because we perceive no plain error in that aspect of the ICA's decision, we will not address the disorderly conduct conviction.").

Consequently, although Bolosan has not challenged the ICA's determination that the requirements to maintain a "lack of knowledge defense" to a driving without no-fault insurance charge set forth in *State v. Palpallatoc*, 71 Haw. 178, 182, 787 P.2d 214, 216 (1990), apply to charges arising before the effective date of the 1990 amendments to HRS § 431:10C–117, because we believe that determination was plainly incorrect, we will address that issue in this opinion.[6]

B. *Lack of Knowledge Defense to Driving Without No–Fault Insurance Charge*

In 1988, the legislature established a "good faith defense, including but not limited to lack of knowledge" to a driving without no-fault insurance charge. *See* Act 345, § 1, 1988 Haw.Sess.Laws 659 (amending HRS § 431:10C–117 (Spec.Pamphlet 1987)). This "lack of knowledge" defense was available to Bolosan at the time he was cited for violating HRS § 431:10C–104.

■ The lack of knowledge defense is not an affirmative defense. *See* HRS § 701–115(3) (1985).[7] Therefore, when evidence of facts comprising the defense are presented in a case, "the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in the light of any contrary prosecution evidence, raises a reasonable doubt as to the defendant's guilt." HRS § 701–115(2)(a). In other words, if evidence raises the lack of knowledge defense, the State has the burden of disproving that defense beyond a reasonable doubt. *See State v. Gabrillo*, 10 Haw.App. 448, 456, 877 P.2d 891, 895 (1994); *see also* HRS §§ 701–114(1)(a) (1985), 702–205(b) (1985). The State is only required to disprove a defense, however, if evidence to support the defense is present. HRS § 701–115(2) ("No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented.").

In the instant case, Bolosan argues that the evidence that he was driving a friend's car and did not know it was uninsured was sufficient to raise the lack of knowledge de-

---

**5.** The conference committee report regarding the enactment of HRS § 602–59 stated in pertinent part:

> [T]he application for writ of *certiorari* must state "errors of law or fact" or "inconsistencies in the decision of the [ICA] with that of the Supreme Court, Federal decisions or its own decisions, and the magnitude of such errors or inconsistencies dictating the need for further appeal." *It must be observed, that such requirement is directed only to the application for the writ. It is not descriptive of the scope of review determinative of the Supreme Court's decision to grant or deny certiorari. The Supreme Court's power in that regard is intended to simply be discretionary.*

Conf.Comm.Rep. No. 73, in 1979 Senate Journal, at 992 (emphasis added).

**6.** On the other hand, we perceive no plain error in the ICA's decision regarding the constitutionality of the exit order and pat-down search. Consequently, because the State did not file a timely application for a writ of certiorari to review that aspect of the ICA's decision, we will not address it and will leave undisturbed the ICA's reversal of the convictions of the two drug-related offenses.

**7.** HRS § 701–115(3) provides:

> (3) A defense is an affirmative defense if:
> (a) It is specifically so designated by the Code or another statute; or
> (b) If the Code or another statute plainly requires the defendant to prove the defense by a preponderance of the evidence.

Because the HRS § 431:10C–117 does not designate the lack of knowledge defense to be an affirmative defense and does not plainly require the defendant to prove the defense by a preponderance of the evidence, the lack of knowledge defense is not an affirmative defense.

fense. Whether this evidence was sufficient depends on our interpretation of the lack of knowledge defense set out in the 1988 amendment to HRS § 431:10C–117. In considering this issue, we are mindful that "[o]ur primary duty in interpreting and applying statutes is to ascertain and give effect to the legislature's intention to the fullest degree." *State v. Feldhacker,* 76 Hawai'i 354, 357, 878 P.2d 169, 172 (1994) (citation and quotation marks omitted).

The interpretation of the lack of knowledge defense was before this court once before. *See State v. Palpallatoc,* 71 Haw. 178, 787 P.2d 214 (1990). In that case, we noted that "[t]he plain language of the statute . . . does not make clear what constitutes the good faith defense of lack of knowledge," and "[t]he statute's legislative history provides no guidance." *Id.* at 181, 787 P.2d at 215. We therefore attempted to discern the legislative intent based on the general purposes of the no-fault law. *Id.* at 181, 787 P.2d at 216 (citing HRS § 431:10C–102). Ultimately, we held that "in order to satisfy the good faith defense of lack of knowledge, the borrower of a vehicle must at least inquire of the owner whether or not the vehicle is insured." *Id.* at 182, 787 P.2d at 216.

In the meantime, on February 16, 1990, the same day that the *Palpallatoc* opinion was issued, a Senate Standing Committee report had been presented at the legislature regarding a proposed amendment to HRS § 431:10C–117. *See* Sen.Stand.Comm.Rep. No. 2164, in 1990 Senate Journal, at 929. The report stated in part:

> Your Committee considered amendments to the statute's exculpatory language regarding "lack of knowledge . . . of insurance", but decided that the current language was sufficient. However, recognizing a possible need to clarify the legislative intent, your Committee uses this report as a means to clearly express that intent. Specifically, we find it is reason-

able for a driver who borrows a car to assume that the borrowed vehicle is insured. The reasonableness of this assumption derives from the mandatory provisions of our automobile insurance law. The assumption is, however, rebuttable by proof of knowledge of the uninsured status of the vehicle.

*Id.*

Although this committee report was not extant when the lack of knowledge defense was originally enacted or when Bolosan was arrested, as relevant subsequent legislative history, the report can be used to determine the original legislative intent. *See Sol v. AIG Hawai'i Ins. Co.,* 76 Hawai'i 304, 307–08, 875 P.2d 921, 924–25, *reconsideration denied,* 76 Hawai'i 353, 877 P.2d 890 (1994); *Pacific Int'l Servs. Corp. v. Hurip,* 76 Hawai'i 209, 217, 873 P.2d 88, 96 (1994). The report clearly indicates that the legislature had originally intended that it would be considered "reasonable for a driver who borrows a car to assume that the borrowed vehicle is insured" and that such an assumption would only be "rebuttable by proof of [the driver's] knowledge of the uninsured status of the vehicle." [8]

■ Thus, it is evident that our interpretation of the lack of knowledge defense in *Palpallatoc* was wrong and must be overruled. *See State v. Nakata,* 76 Hawai'i 360, 371, 878 P.2d 699, 710 (overruling in part *State v. Jordan,* 72 Haw. 597, 825 P.2d 1065 (1992) because subsequent legislative history revealed our "erroneous interpretation" of the legislative intent in that case), *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). Under the correct interpretation of the lack of knowledge defense, as originally enacted, if a driver borrows an uninsured vehicle, the State must prove beyond a reasonable doubt that the driver actually knew that the vehicle was

---

8. In accordance with this intent, the House of Representatives had proposed to amend HRS § 413:10C–117 to include, *inter alia,* the following language: "it shall be a defense for any person cited for driving without a valid no-fault insurance policy if the person lacks knowledge that the vehicle is not insured." The legislature recognized that this "clarifying language" had been "added to specifically address the intent of the [l]egislature to allow for the defense of lack of knowledge and not require the duty imposed in the *Palpallatoc* case." Conf.Comm.Rep. No. 113, in 1990 Senate Journal, at 813–14.

uninsured at the time he or she was operating it.

The legislature, however, not only recognized that we had misinterpreted the original legislative intent with respect to the lack of knowledge defense, but also amended HRS § 431:10C–117 by adding a provision specifically addressing the lack of knowledge defense in the context of borrowed vehicles. According to that amendment, "[t]he general penalty provision of [HRS § 431:10C–117] shall not apply to ... [a]ny operator of a borrowed motor vehicle if the operator holds a reasonable belief that the subject vehicle is insured." Act 167, § 1, 1990 Haw.Sess.Laws 328 (codified as HRS § 431:10C–117(a)(2)(C) (Supp.1992)).

This amendment was enacted specifically "to address the issues raised in the recent *Palpallatoc* case[.]" Conf.Comm.Rep. No. 113, in 1990 Senate Journal, at 813–14. The principal issue raised in *Palpallatoc* was that "allowing drivers to escape penal responsibility for operating uninsured motor vehicles by failing to inquire as to whether or not that vehicle is insured would frustrate the purpose of the statute, since the objective of the no-fault system is to have all vehicles being operated on the highways insured." 71 Haw. at 182, 787 P.2d at 216.

In light of this issue, the legislature recognized that "there may be instances in which a person borrowing a vehicle should affirmatively ascertain whether it is insured." Conf. Comm.Rep. No. 113, in 1990 Senate Journal,

at 813–14. Consequently, the amendment was enacted to "create[ ] a standard for determining when a borrower of a vehicle is not subject to the penalties provided [in HRS § 431:10C–117]. Specifically, if a borrower of a vehicle holds a reasonable belief that it is insured, he [or she] has no duty to affirmatively ascertain whether the motor vehicle is insured." *Id.*[9]

As noted by the ICA, the amendment "did not become effective until its approval on June 19, 1990, after [Bolosan] had already been charged in this case." *Bolosan,* 78 Hawai'i at 106, 890 P.2d at 693. Accordingly, we agree with the following analysis of the ICA:

> Pursuant to HRS § 1–3 (1985), "no law has any retrospective operation, unless otherwise expressed or obviously intended." We are unable to discern, in either the language of [the amendment] or its legislative history, any expressed or obvious intention by the legislature that the new standard established for a good faith defense be applied retroactively.

*Id.*

■ We disagree, however, with the ICA's conclusion that because the 1990 amendment did not have retroactive effect the interpretation of the lack of knowledge defense set forth in *Palpallatoc, supra,* controls. As discussed above, *Palpallatoc* was wrongly decided and cannot control. Instead, the correct interpretation of the lack of knowledge defense, as originally enacted, must control.[10]

9. In *State v. Kahaunaele,* 10 Haw.App. 519, 879 P.2d 566 (1994), the ICA addressed the lack of knowledge defense in cases that arose after the 1990 amendment was enacted. In its discussion, the ICA treated the 1990 amendment as creating a "reasonable belief defense" that was distinct from the "good faith defense" originally enacted in 1988. We disagree because, as discussed in the text, the legislative history indicates that the 1990 amendment simply created a standard for determining how the good faith defense of lack of knowledge applies in the case of borrowed vehicles.

Despite this disagreement, we believe that the following analysis from the *Kahaunaele* opinion accurately characterizes the lack of knowledge defense subsequent to the 1990 amendment:

> [T]he borrower of a motor vehicle has a statutory right to reasonably believe that the borrowed motor vehicle is insured. Evidence that the defendant borrowed and operated upon a

public street a motor vehicle that was not insured under a no-fault policy is sufficient evidence to sustain [the lack of knowledge defense]. The fact that the borrower did not consider whether or not the borrowed motor vehicle was insured does not negate [the] defense. However, if one or more relevant facts reasonably required the borrower to inquire, he or she then had a duty to inquire until he or she reasonably believed that the motor vehicle was insured. The borrower's failure to satisfy that duty to inquire negatives [the] defense[ ].

10 Haw.App. at 531, 879 P.2d at 571.

10. Since we issued the writ of certiorari in this case, the ICA decided *State v. Gray,* 77 Hawai'i 476, 888 P.2d 376 (App.1995). In *Gray,* relying on its opinion in the instant case, the ICA again held that *Palpallatoc* was the controlling law with respect to the lack of knowledge defense for

Under that interpretation, if Bolosan had borrowed the uninsured vehicle, the State was required to prove that he actually knew that the vehicle was uninsured at the time he was operating it.

In the instant case, the State concedes that Bolosan had borrowed the uninsured vehicle from a friend. Therefore, in order to defeat the lack of knowledge defense, the State was required to prove beyond a reasonable doubt that Bolosan actually knew that the vehicle was uninsured. We find no evidence in the record to support such a finding.

Thus, the State failed to disprove Bolosan's lack of knowledge defense beyond a reasonable doubt. The driving without no-fault insurance conviction must therefore be reversed.

### C. *Reasonable Suspicion to Stop*

With respect to the driving without a license conviction, Bolosan does not challenge the sufficiency of the evidence presented but contends that the evidence should have been suppressed because it was obtained in violation of article I, section 7 of the Hawai'i Constitution. The challenged evidence was obtained after Officer Asato stopped the vehicle that Bolosan was driving and asked to see Bolosan's driver's license.

■ It is well-settled that when a police officer lawfully stops a motor vehicle, it is not unconstitutional for the officer to ask the driver to produce his or her license. *State v. Aguinaldo*, 71 Haw. 57, 64, 782 P.2d 1225, 1229 (1989). Thus, the issue whether the evidence that Bolosan was driving without a license should have been suppressed turns on whether the initial stop was lawful.

■ A stop of a vehicle for an investigatory purpose constitutes a seizure within the meaning of the constitutional protection against unreasonable searches and seizures. *Kernan v. Tanaka*, 75 Haw. 1, 37, 856 P.2d 1207, 1225 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994).

In determining the reasonableness of wholly discretionary automobile stops, this court has repeatedly applied the standard set forth in *Terry v. Ohio*, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968). *See State v. Bonds*, [59 Haw. 130, 577 P.2d 781 (1978) ]; *State v. Ogata*, 58 Haw. 514, 572 P.2d 1222 (1977); *State v. Barnes*, 58 Haw. 333, 568 P.2d 1207 (1977); *State v. Goudy*, 52 Haw. 497, 479 P.2d 800 (1971). Guided by *Terry*, we stated in *State v. Barnes:*

> To justify an investigative stop, short of arrest based on probable cause, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio, supra* [392 U.S.], at 21 [88 S.Ct. at 1880]. The ultimate test in these situations must be whether from these facts, measured by an objective standard, a man of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate.

58 Haw. at 338, 568 P.2d at 1211 (citations omitted).

*State v. Powell*, 61 Haw. 316, 321–22, 603 P.2d 143, 147–48 (1979).

In the instant case, at the hearing on the motion to suppress and in its appellate brief before the ICA, the State attempted to justify the stop based on Officer Asato's suspicion that Bolosan had engaged in an exhibition of speed in violation of HRS § 291C–103. The ICA held, and we agree, that given the conduct and state of mind required to violate that statute, Officer Asato's suspicion was not objectively reasonable. *Bolosan*, 78 Hawai'i at 102, 890 P.2d at 689.

The ICA, however, then concluded as follows:

> Since the evidence in this case clearly establishes that Officer Asato heard the engine of [Bolosan]'s vehicle revving loudly and saw the vehicle emitting a plume of heavy exhaust smoke, a reasonable person in the shoes of Officer Asato would have been warranted in believing that [Bolosan] was operating a vehicle in violation of ROH

offenses arising before the effective date of the 1990 amendment to HRS § 431:10C–117. *Gray,*

77 Hawai'i at 478, 888 P.2d at 378. On this issue, we overrule *Gray*.

§ 15–19.28 [(the muffler ordinance)]. The police were therefore justified in stopping [Bolosan] to investigate this potential violation, and Officer Asato's articulation of the incorrect basis for the stop does not render it invalid. *Cf. State v. Vance*, 61 Haw. 291, 297, 602 P.2d 933, 938–39 (1979) ...; *State v. Kimball*, 54 Haw. 83, 87, 503 P.2d 176, 179 (1972) ...; *State v. Hollis*, 161 Vt. 87, 92, 633 A.2d 1362, 1365 (1993).

*Id.* at 103, 890 P.2d at 690.

The cases cited by the ICA:

stand for the proposition that the validity of an arrest hinges upon whether the officer had probable cause to arrest, not whether the officer articulated the correct basis for the arrest. Thus, when an officer's arrest is properly supported by probable cause to arrest for a particular offense, neither the officer's subjective reliance on an offense for which there is no probable cause, nor the officer's verbal announcement of the wrong offense, vitiates the arrest.

Nevertheless, while the courts generally employ an objective standard in assessing the legal basis for an arrest, they will not "indulge in *ex post facto* extrapolations of all crimes that might have been charged on a given set of facts at the moment of arrest." *United States v. Atkinson*, 450 F.2d 835, 838 (5th Cir.1971). In order to prevent post-hoc justifications for otherwise invalid arrests, *Atkinson* limited the two-part objective test by holding that where probable cause does not exist for the articulated offense, there is a valid arrest only if that offense and the offense for which there is probable cause, are related. *Id.* . . . .

. . . .

Generally, offenses are related when "the conduct that served as the basis for the charge for which there was no probable cause could, in the eyes of a similarly situated reasonable officer, also have served as the basis for a charge for which there was probable cause." *Trejo v. Perez*, 693 F.2d 482, 486 (5th Cir.1982)[.]

*Hollis*, 161 Vt. at 93–94, 633 A.2d at 1365–66 (citations omitted); *accord Vance*, 61 Haw. at 297, 602 P.2d at 939 ("It is important to note

that, as in *State v. Kimball, supra*, the offense mistakenly charged and the offense warranted by the appellant's behavior are closely related.").

The above-cited cases all deal with arrests based on probable cause. Whether the same rule should apply to investigatory stops based on reasonable suspicion is a more difficult question. In *United States v. Hawkins*, 811 F.2d 210 (3d Cir.1987), the court considered whether investigatory stops could be justified based on an offense other than that stated by the officers involved. Judge Rosenn, in dissent, argued that although the probable cause standard is a purely objective one, the reasonable suspicion standard "must be *both* objectively reasonable *and* subjectively *actual.*" 811 F.2d at 222 (emphasis in original). Judge Rosenn's analysis stated in part:

Because an investigatory stop is less severe in its requirements than a warrantless arrest, the Supreme Court has required only a reasonable suspicion standard. By its very terms, however, a suspicion in essence is perception or belief and is, therefore, inherently subjective.

. . . . The law is much more fully developed on the standards for a full arrest than for a *Terry* stop and the probable cause standard has been held to be objective. Thus, it has further been held that the court may supply grounds not in fact relied upon to support probable cause for a full arrest.

The Supreme Court has declined to hold that the reasonable suspicion standard is similarly purely objective as to warrant a finding of such a "constructive suspicion."

. . . .

The language of the *Terry* opinion indicates only that officers' subjective suspicions must be objectively reasonable, not that they may be supplied by the court.

*Id.* (footnote omitted).

The *Hawkins* majority, however, rejected Judge Rosenn's analysis, reasoning that

[t]he probable cause and reasonable suspicion tests are similar in that they both look to the incriminating facts known to the seizing officer to determine the validity of

a "seizure" under the Fourth Amendment. *See Terry,* 392 U.S. at 16–20, 88 S.Ct. at 1877–79. Thus, in *United States v. Hensley,* 469 U.S. [221,] 230–33, 105 S.Ct. [675,] 681–83 [83 L.Ed.2d 604], an investigatory stop case, the Supreme Court relied interchangeably on arrest and stop cases. *Id.* at 215 n. 5. Consequently, although the officers in that case testified that the reason that they stopped the car that the defendant was in was to conduct an investigation of alleged traffic violations, the *Hawkins* majority held that the stop was justified because the officers' observations gave rise to an objectively reasonable suspicion that the occupants of the car were engaged in the sale and purchase of narcotics. *Id.* at 212–13.

■ Other courts have similarly held that police officers' subjective reasons for conducting investigatory stops are generally not controlling because the reasonable suspicion test is measured on an objective standard. *See, e.g., United States v. Cardona–Rivera,* 904 F.2d 1149 (7th Cir.1990); *Marbury v. United States,* 540 A.2d 114 (D.C.App.1985); *State v. Baudhuin,* 141 Wis.2d 642, 416 N.W.2d 60 (1987); *but see State v. Jamison,* 482 N.W.2d 409, 413 (Iowa 1992) ("We have consistently held that in determining the validity of an investigative stop police officers are bound by the real reasons for their actions."). This court has also disapproved of analyses of officers' subjective bases for conducting investigatory stops in favor of an objective standard, *see Powell,* 61 Haw. at 322–23 & n. 6, 603 P.2d at 148 & n. 6 (citing *State v. Bonds,* 59 Haw. 130, 138, 577 P.2d 781, 786 (1978)), and we see no reason to depart from that position.

Thus, the reasonable suspicion test under article I, section 7 of the Hawai'i Constitution is generally measured on an objective standard and, therefore, in appropriate cases, an investigative stop may be justified based on an offense other than that articulated by the officer involved. The adoption of an objective standard, however, does not necessarily mean that a seizure may be justified based on *any* other offense. For instance, although probable cause is generally governed by an objective test, the objective test has been limited to offenses related to the offense articulated by the arresting officer "[i]n order to prevent post-hoc justifications for otherwise invalid arrests." *Hollis,* 161 Vt. at 93, 633 A.2d at 1366.

■ We are equally concerned about post-hoc justifications for otherwise invalid investigatory stops, especially those involving automobile stops. *Cf. Doctor v. State,* 596 So.2d 442, 446 (Fla.1992) ("In *Kehoe v. State,* 521 So.2d 1094, 1096 (Fla.1988), this Court observed that '[w]hen the police realize that they lack a founded suspicion, they sometimes attempt to justify a stop on some obscure traffic violation.'"). Therefore, we hold that an investigative stop can be justified based on an objectively reasonable suspicion of any offense, provided that the offense for which reasonable suspicion exists is related to the offense articulated by the officer involved.[11] Offenses are related when the conduct that gave rise to the suspicion that was not objectively reasonable with respect to the articulated offense could, in the eyes of a similarly situated reasonable officer, also have given rise to an objectively reasonable suspicion with respect to the justifiable offense. *Cf. Hollis,* 161 Vt. at 94, 633 A.2d at 1366.

■ Thus, the question in the instant case becomes whether the conduct that gave rise to Officer Asato's suspicion that Bolosan had committed an exhibition of speed in violation of HRS § 291C–103 could, in the eyes of a

11. In *Doctor,* the Supreme Court of Florida "stated a more stringent rule[.]" 596 So.2d at 446. Under that court's formulation, "a stop will not be valid just because an officer *could* have lawfully made the stop[.]" *Id.* (emphasis in original). Rather, "[t]he State must show that under the facts and circumstances a reasonable officer *would* have stopped the vehicle absent an addition invalid purpose." *Id.* (emphasis in original) (quoting *Kehoe,* 521 So.2d at 1097).

Because police officers, within their discretion, may or may not stop a vehicle even when confronted with facts sufficient to raise an objectively reasonable suspicion of a traffic violation, asking the courts to determine what a reasonable officer would have done is an impracticable request. Moreover, we believe that the requirement that the justifiable offense be related to the articulated offense adequately protects against wholly pretextual stops. Therefore, we decline to adopt the stringent rule stated in *Doctor.*

similarly situated reasonable officer, also have given rise to an objectively reasonable suspicion that Bolosan was violating the muffler ordinance. The ICA answered this question in the affirmative. *Bolosan,* 78 Hawai'i at 103, 890 P.2d at 690.

Bolosan urges us to reverse the ICA's decision on the ground that the exhibition of speed offense and the muffler ordinance are not related offenses as a matter of law. We decline to do so.

Observations of noise and/or smoke being emitted from a car clearly could give rise to an objectively reasonable suspicion that the muffler ordinance was being violated. In the instant case, Officer Asato's suspicion that Bolosan had committed an illegal exhibition of speed, though not objectively reasonable, was based on observations of noise and smoke coming from the car that Bolosan was driving. Thus, we cannot say that the exhibition of speed offense and the muffler ordinance are not related offenses.

Bolosan, however, further argues that because he did not have on opportunity to cross-examine Officer Asato with respect to the muffler ordinance the ICA erred in concluding that the conduct observed by Officer Asato did in fact give rise to an objectively reasonable suspicion that Bolosan was violating the muffler ordinance. We agree.

In order to have given rise to an objectively reasonable suspicion that the muffler ordinance was being violated, Officer Asato's observations would have had to suggest that "excessive or annoying fumes or smoke" or "excessive or unusual noise" was coming from the car on account of either the car's muffler, or lack thereof, ROH § 15–19.28(a), or other equipment or adjustment of the car's motor and/or exhaust system. ROH § 15–19.28(b).[12] The only description of Officer Asato's observations, however, was that he "heard a loud engine revving and heavy exhaust coming from his vehicle."

To "rev" an engine is "to accelerate sharply the speed of" the engine. *See* The Random House College Dictionary 1129 (rev. ed. 1979). This suggests that the noise coming from the car appeared to Officer Asato to be the result of Bolosan accelerating the speed of the car's engine. Because engines ordinarily are louder when operated at higher speeds, the description of the revving as "loud" could simply indicate that the engine was brought to a high rate of speed. Officer Asato's belief that Bolosan had committed an illegal exhibition of speed is consistent with such an interpretation. Moreover, there was no testimony specifically addressing whether the noise could reasonably be considered to be "in excess of the usual noise which would necessarily result from the operation of a motor when reduced to the minimum by a muffler" as required for a violation of the muffler ordinance. Similarly, there was no testimony as to whether the "heavy exhaust" could reasonably be considered "excessive or annoying," or if it was merely commensurate with the revving of the engine. Furthermore, there is no indication in the record that the "loud engine revving and heavy exhaust" was persistent as would be expected if the motor and/or exhaust system had been improperly equipped or adjusted; Officer Asato only testified that he noticed the revving and exhaust while the car that Bolosan was driving was stopped at an intersection.

Because the record was not fully developed in this context, it was inappropriate for the ICA to hold that there was an objectively reasonable suspicion that Bolosan had violated the muffler ordinance. In order to determine if Officer Asato's observations could have supported such an objectively reasonable suspicion, the nature of his observations needs to be more thoroughly explored. In particular, Bolosan must be given the opportunity to cross-examine Officer Asato with respect to the amount of noise and smoke that was observed coming from the car and the apparent cause thereof.

This is not to say that remand will be necessary in every case in which a seizure can be justified only based on an offense other than that articulated by the officer involved. In *Marbury v. United States,* 540 A.2d 114 (D.C.App.1985), for example, the court held that the stop of the defendant's vehicle was justified based on the officer's

12. *See supra* note 3.

observation that the defendant "failed to put on his lights" when driving at 9:30 in the evening and rejected the defendant's argument "that since the defense did not have an opportunity to cross-examine [the officer] on this point, the case should be remanded for a hearing on this issue." 540 A.2d at 115 n. 2. In that case, however, the record revealed that the officer was in fact cross-examined regarding whether the defendant's car had been driven without its lights on. *Id.* Thus, the court stated that "[s]ince this issue was joined at the suppression hearing, and squarely resolved against [the defendant], no purpose would be served by a remand here." *Id.* In the instant case, on the other hand, the record does not reveal any direct testimony or cross-examination going to whether the noise or smoke coming from the car that Bolosan was driving could be considered excessive within the meaning of the muffler ordinance.

Thus, although it is possible that the initial stop could be justified based on an objectively reasonable suspicion that the muffler ordinance was being violated, because Bolosan did not have the opportunity to cross-examine Officer Asato regarding the amount of noise and smoke that was observed coming from the car and the apparent cause thereof, the ICA's conclusion that such reasonable suspicion existed cannot stand. We therefore vacate the driving without a license conviction and remand for further proceedings to determine whether Officer Asato's observations were sufficient to give rise to an objectively reasonable suspicion that Bolosan had violated the muffler ordinance. If the observations were sufficient, the driving without a license conviction shall be reinstated; if not, the conviction shall be reversed.

## III. *CONCLUSION*

For the foregoing reasons, we reverse Bolosan's driving without no-fault insurance conviction, vacate the driving without a license conviction, and remand for further proceedings on the constitutionality of the initial stop. In addition, we leave undisturbed the ICA's reversal of the convictions of the two drug-related offenses.