6 P.3d 374

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Saul N. RAMOS, Defendant–Appellant.**

**No. 22105.**

Intermediate Court of Appeals of Hawai'i.

April 3, 2000.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

Jacob M. Merrill, on the briefs, Honolulu, for defendant-appellant.

WATANABE, ACOBA, and LIM, JJ.

Opinion of the Court by LIM, J.

Defendant–Appellant Saul N. Ramos (Ramos) was convicted after a jury trial of violating Hawai'i Revised Statutes (HRS) § 712–1243, promoting a dangerous drug in the third degree,[1] and sentenced to a five-year

---

1. Hawai'i Revised Statutes § 712–1243 (1993 & Supp.1997) provided:

(1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

(2) Promoting a dangerous drug in the third degree is a class C felony.

(3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of

indeterminate term of imprisonment with a mandatory minimum term of two-and-one-half years.

Ramos now appeals the first circuit court's November 9, 1998 judgment, conviction and sentence, asserting that the trial court should have granted his pretrial motion to suppress evidence. We agree.

## I. Background.

On Saturday, July 19, 1997, at 4:16 p.m., Officer Raphael Aguilar Hood (Officer Hood) received a radio dispatch to investigate a report of a male with a knife chasing another male at a Chevron gas station on the corner of North King Street and Robello Lane.

The male with the knife was described as skinny, wearing black shorts and a blue shirt. The other male was described as Portuguese, in his late twenties, heavy-set and wearing a white tank top.[2]

When Officer Hood arrived on the scene at 4:23 p.m., he saw a male who closely fit the description of the male with the knife, as well as another male, a woman in a wheelchair and a silver car.

Officer Hood noticed that the male fitting the description of the man with the knife, Ramos, was "acting funny" and "sweating a lot." When Officer Hood got out of his vehicle, Ramos rapidly approached him with his hands in his pockets. Ramos was moving his hands in his pockets, which made Officer Hood nervous.

Officer Hood immediately informed Ramos that he was investigating a report of a man with a knife, and asked Ramos to take his hands out of his pockets. Ramos failed to comply, and continued to rapidly approach Officer Hood. Officer Hood then grabbed both of Ramos' wrists, turned him around and pinned him against the police vehicle.

At this time, Officer Hood noticed that Ramos smelled of alcohol and that his eyes were red. Officer Hood again explained what he was investigating and why he needed to see Ramos' hands. Ramos still refused to remove his hands from his pockets, so Officer Hood placed him on the ground, took Ramos' hands out of his pockets and handcuffed him behind his back.

Officer Hood then did a pat down of Ramos to check for a knife. The pat down lasted for about five to six seconds. Officer Hood did not feel anything in Ramos' pockets.

While handcuffed, Ramos continued to argue and struggle.

Sergeant Costa (Sgt.Costa) arrived on the scene shortly after Officer Hood. Sgt. Costa saw Officer Hood with a male loosely fitting the dispatch description of the knife-wielding suspect. Sgt. Costa testified that the male was thin, wearing dark shorts and a black shirt. Sgt. Costa also saw a heavy-set man standing near a silver car, who was later identified as Eric Kobayashi (Kobayashi).

Sgt. Costa watched Officer Hood take Ramos to the ground and handcuff him. Sgt. Costa also noticed that Ramos was argumentative and that his eyes were red, bloodshot and glassy.

Sgt. Costa asked Kobayashi if there was a knife involved. Kobayashi said no knife was involved. Kobayashi insisted that everything was all right.

Sgt. Costa ran the license plate of the silver car and found that Kobayashi was the registered owner. After obtaining Kobayashi's consent, Sgt. Costa searched the silver car for a knife but did not find one. Sgt. Costa also made a "cursory" search of the grounds of the Chevron station. He talked to the Chevron mini-mart clerk, who said she had seen nothing. Sgt. Costa testified that other officers who had arrived on the scene may have helped by searching the grounds and interviewing other possible witnesses.

By this time, Sgt. Costa had determined that Kobayashi and Ramos had had an argument, but that no knife was involved. Sgt.

which shall be not less than thirty days and not greater than two-and-a-half years, at the discretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

2. This man was later identified as Eric Kobayashi, who is in his forties and is not Portuguese.

Costa testified, but was not certain, that Kobayashi may have identified Ramos as "Saul Ramos" during the investigation.

Having found no weapon, and observing Ramos to be calm, Sgt. Costa ordered Officer Hood to remove the handcuffs. Ramos had apparently been sitting handcuffed while the investigation proceeded.

Sgt. Costa testified that although no weapon had been found, the police had not completely ruled out the possibility of a knife. He testified from past experience that sometimes a weapon not found during a preliminary search turns up later.

Sgt. Costa estimated that his investigation, up until removal of the handcuffs, lasted between ten and eighteen minutes.

Officer Hood removed the handcuffs and upon Sgt. Costa's instructions asked Ramos for some identification. Ramos then "put his hand in his right-front pocket and kept it there for a long time." Ramos asked Officer Hood why he was "messing" with him, and told him that he was a good guy and wasn't doing anything.

Officer Hood observed that Ramos was shaking, sweating profusely, stammering, and moving both of his hands inside his pockets. This alarmed Officer Hood, who felt that his pat down of Ramos may not have been thorough. Officer Hood felt that "there was something wrong with this guy."

When Ramos took his hand out of his right pocket, Officer Hood saw that he held a white envelope, folded in half and torn at the top. Through the torn opening, Officer Hood saw what appeared to be plastic ziploc bags of crystal methamphetamine. Officer Hood snatched the envelope from Ramos, who snatched it right back and threw it into the silver car.

The police officers asked Kobayashi if the envelope belonged to him. Kobayashi said no. With Kobayashi's permission, the envelope was recovered from where it landed between the two front seats of the car. The envelope contained seven packets of crystal methamphetamine, and eight other empty packets.

After establishing Ramos' identity, Sgt. Costa and Officer Hood ran a warrant check on him and then arrested him on two outstanding bench warrants.

On May 14, 1998, Ramos filed a motion to suppress the fifteen ziploc packets. Ramos argued that the warrantless seizure of the packets violated his rights under article I, section 7, of the Hawai'i State Constitution and the Fourth and Fourteenth Amendments to the United States Constitution.

The trial court entered its findings of fact (FsOF) and conclusions of law (CsOL) denying Ramos' motion on July 14, 1998.

On July 31, 1998, a jury found Ramos guilty as charged. On November 9, 1998, the trial court entered its judgment, convicting Ramos of promoting a dangerous drug in the third degree and sentencing him to a five-year indeterminate term of imprisonment with a mandatory minimum term of two-and-one-half years.

On appeal, Ramos argues that the trial court should have granted his motion to suppress, claiming that reasonable suspicion of criminal activity dissipated when no knife and no complainant turned up. Ramos maintains that any subsequent detention was unlawful and any evidence uncovered as a result must be suppressed.

Specifically, Ramos contends the trial court made the following erroneous FsOF and CsOL:

4. [Sgt. Costa] had just arrived on the scene as Officer Hood was handcuffing [Ramos]. While [Ramos] was handcuffed, Sgt. Costa conducted a quick investigation to locate the knife and [to] secure the scene. The cashier at the station did not know anything. A quick check of the area produced no knife. [Kobayashi] admitted that he and [Ramos] were involved in an argument but he denied that any knife was involved. A quick check of [Kobayashi's] car produced no knife.

6. The handcuffs had been on [Ramos] for approximately 30 seconds.

15. The court finds that the police acted reasonably in securing the scene and attempting to locate the knife before obtaining identification from the parties, and that

their request for [Ramos'] identification after removing the handcuffs was a reasonable continuation of their investigation of the argument/weapons case.

With respect to FOF 4, Ramos challenges the trial court's characterization of the investigation as "quick."

## II. Standards of review.

██ We apply the following standard in reviewing a trial court's denial of a motion to suppress evidence:

Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard. Furthermore ... the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his own Fourth Amendment rights were violated by the search and seizure sought to be challenged. The proponent of the motion to suppress must satisfy this burden of proof by a preponderance of the evidence.

*State v. Balberdi,* 90 Hawai'i 16, 20–21, 975 P.2d 773, 777–78 (App.1999) (citing *State v. Anderson,* 84 Hawai'i 462, 466–67, 935 P.2d 1007, 1011–12 (1997)).

██ We review a ruling on a motion to suppress *de novo* in order to determine whether it was right or wrong as a matter of law. *State v. Kauhi,* 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997).

## III. The trial court erred in denying Ramos' motion to suppress evidence.

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, section 7 of the Hawai'i State Constitution provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

██ We have not hesitated to extend the protections afforded under article I, section 7 of the Hawai'i State Constitution beyond those available under the cognate Fourth Amendment to the United States Constitution " 'when logic and a sound regard for the purposes of those protections have so warranted.' " *State v. Kachanian,* 78 Hawai'i 475, 480, 896 P.2d 931, 936 (App.1995)(quoting *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58 (1974)).

Textual support for this expansive approach inheres in the prohibition against "unreasonable ... invasions of privacy" contained in article I, section 7 but not found in the Fourth Amendment. *See, e.g., State v. Lopez,* 78 Hawai'i 433, 445–47, 896 P.2d 889, 901–03 (1995)(relying in part upon the textual accretion, requiring actual authority for third-party consents to search, in contradistinction to the United States Supreme Court's acceptance of mere apparent authority).

### A. The initial stop was a lawful investigative stop.

On appeal, Ramos does not concede the initial stop was lawful, but does not seriously argue otherwise. We conclude that it was lawful.

██ In certain situations, the police may temporarily detain a person without a war-

rant, in what is known as an investigative stop. Whether the encounter between Ramos and Officer Hood was initially a lawful investigative stop depends upon the facts of the situation:

> To justify an investigative stop, short of arrest based on probable cause, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.... The ultimate test in these situations must be whether from these facts, measured by an objective standard, a [person] of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate.

*State v. Bolosan*, 78 Hawai'i 86, 92, 890 P.2d 673, 679 (1995) (internal quotation marks and citations omitted).

■ Here, the initial stop of Ramos was lawful.

Police dispatch informed Officer Hood and Sgt. Costa that a male with a knife was chasing another male at a specific location. The dispatch description of the knife-wielding suspect closely matched Ramos, who was at the specified location. As he approached Officer Hood, Ramos was perspiring profusely and "acting funny," indications that he may have been involved in a recent altercation. Ramos' unbidden, rapid approach with his hands moving in his pockets added an ominous ambiguity to the situation. *See State v. Ward*, 62 Haw. 459, 461, 617 P.2d 565, 566 (1980)(tipster information which is insufficient for arrest on probable cause may be sufficiently corroborated by on-scene police observations to justify a limited investigatory stop).

With this testimony, Officer Hood articulated specific facts which established his objectively reasonable belief that "criminal activity was afoot." *Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679.

Moreover, Officer Hood twice explained to Ramos that he was investigating an altercation involving a knife and thus needed to see his hands. When Ramos refused to comply with Officer Hood's repeated requests to see his hands, Officer Hood first grabbed Ramos' wrists and pinned him to a vehicle, then forced Ramos to the ground, extracted his hands from his pockets and handcuffed him. From an objective standpoint, Officer Hood acted appropriately in light of the totality of the circumstances.

The initial stop in this case met the applicable constitutional test.

■ Officer Hood then proceeded to conduct a pat down search of Ramos. A pat down search by a police officer during an investigative stop "is justified only if from the specific conduct of the [person], or from reliable information, or from the attendant circumstances, the officer may reasonably infer that the person stopped is armed and presently dangerous." *Ward*, 62 Haw. at 462, 617 P.2d at 567 (quoting *State v. Barnes*, 58 Haw. 333, 338, 568 P.2d 1207, 1212 (1977)). Such a search is "strictly limited to a pat down of outer clothing for the discovery of weapons if the officer reasonably believes the person stopped is armed and presently dangerous." *State v. Melear*, 63 Haw. 488, 494, 630 P.2d 619, 624 (1981) (citations omitted).

■ In this case, it was objectively reasonable for Officer Hood to believe, from the dispatch report and description, Ramos' behavior and demeanor, and Ramos' refusal to cooperate, that Ramos was armed with a knife and presently dangerous. Furthermore, Officer Hood limited his search to a pat down of Ramos' outer clothing, checking for weapons. The pat down was, therefore, lawful.

B. *The investigative stop was a seizure.*

■ To determine whether the investigative stop of Ramos was a seizure in the constitutional sense, we apply the analysis set forth in *State v. Kearns:*

> The first step of the analysis is to determine when, if at all, a "seizure" in the constitutional sense occurred during the encounter. Under the test approved of in *Quino*, a person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. 74 Haw. at 168–73, 840 P.2d at 362–64. Whether a reasonable person would feel free to leave is deter-

mined under an objective standard that this court reviews *de novo. See State v. Tsukiyama*, 56 Haw. 8, 12, 525 P.2d 1099, 1102 (1974).

. . . .

Accordingly, we hold that a person is seized, for purposes of article I, section 7 of the Hawai'i Constitution, when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information.

*State v. Kearns*, 75 Haw. 558, 566–67, 867 P.2d 903, 907 (1994).

■ Applying the *Kearns* test, Ramos was clearly seized when Officer Hood first made plain to him that he was the focus of a criminal investigation and demanded to see his hands. At that point, a reasonable person in the same circumstances would not have felt free to leave, or that he or she would have been allowed to leave. It goes without saying that the seizure continued throughout the ensuing physical seizure, takedown and handcuffing.

C. *The seizure of Ramos continued beyond the removal of the handcuffs.*

■ Following *Kearns*, we have held that "a seizure is not terminated until a reasonable person in Defendant's situation would believe, under the totality of the circumstances, that he or she was free to leave." *Kachanian*, 78 Hawai'i at 483, 896 P.2d at 939.

■ The seizure continued after Ramos was released from the handcuffs.

Ramos had been forcibly detained, handcuffed and searched by the police, and kept in handcuffs for the duration of the investigation.

■ After Officer Hood removed the handcuffs, he remained in front of Ramos and demanded to see some identification.

Officer Hood did not at any time inform Ramos that he was free to leave, nor did he tell Ramos that he was not obligated to comply with the officer's request. It cannot be said that Ramos consented in any manner to a continuing encounter.[3]

Indeed, Ramos' remonstrations—asking why Officer Hood was "messing with him" and asserting his innocence and essential goodness—suggest that he in fact did not feel free to leave at that point. Under the circumstances, a reasonable person would have similarly believed that he or she was still not free to leave. *Cf. Kachanian*, 78 Hawai'i at 483, 896 P.2d at 939 (referring to police tailing and surveillance of a suspect after an investigative stop of the suspect, "in situations such as this, where Defendant was the focus of a narcotics investigation, was 'seized' illegally, had his bag detained for a 'canine [narcotics] screening[,]' and had his subsequent movements secured by the police pending completion of the screening, a reasonable person would believe that he or she was not free to leave").

Thus under the *Kearns* test, the seizure of Ramos continued after he was released from the handcuffs.

The continuing detention also meets the test for a seizure under *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), which the Hawai'i Supreme Court has adopted. *State v. Quino*, 74 Haw. 161, 170, 840 P.2d 358, 362 (1992). A *Mendenhall* seizure occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.

■ Factors to consider in determining whether a seizure has occurred include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicat-

3. The Hawai'i Supreme Court has held that "an investigative encounter can only be deemed 'consensual' if (1) prior to the start of questioning, the person encountered was informed that he or she had the right to decline to participate in the encounter and could leave at any time, and (2) the person thereafter voluntarily participated in the encounter." *State v. Kearns*, 75 Haw. 558, 571, 867 P.2d 903, 909 (1994) (Kearns' acquiescence to questioning during "walk-and-talk" investigation did not constitute consent because police did not first inform him of his right to decline to participate).

ing that compliance with the officer's request might be compelled." *Id.*

In this case, Ramos had been physically seized, taken to the ground, forcibly hand-cuffed and patted down when he did not comply with Officer Hood's request to show his hands. Several police officers were on the scene. When Ramos was released from his handcuffs, he was not informed that he was then free to leave. Officer Hood faced him and demanded identification. While Officer Hood waited for him to produce identification, Ramos voiced his desire to be left alone, to no avail.

Under the *Mendenhall* test as well, in view of all of the circumstances, Ramos was clearly still seized at this point.

### D. *The seizure of Ramos continued unlawfully beyond its constitutional justification.*

█ The Hawai'i Supreme Court has held that the police may not "prolong the detention of individuals subjected to brief, temporary investigative stops—once such stops have failed to substantiate the reasonable suspicion that initially justified them—solely for the purpose of performing a check for outstanding warrants." *State v. Silva,* 91 Hawai'i 80, 81, 979 P.2d 1106, 1107 (1999). *Cf. Kaluna,* 55 Haw. at 363, 520 P.2d at 55 ("We note at the outset that since it was conducted without a warrant, the search carries an initial presumption of unreasonableness. . . . To overcome this presumption, the State must show that the facts of the case justified the police in searching without a warrant and that the search itself was no broader than necessary to satisfy the need which legitimized departure from the warrant requirement in the first place.") (citations omitted).

█ While Officer Hood subdued and guarded Ramos, Sgt. Costa spoke with Kobayashi, ran a license plate check on the silver car—which showed it belonged to Kobaya-shi—and spoke to the mini-mart clerk. Sgt. Costa and other police officers conducted a search of the silver car and the premises for the alleged knife and questioned other possible witnesses. Sgt. Costa estimated this investigation took about ten to eighteen minutes.

The search yielded no knife, and no one claimed to have seen a knife. Officer Hood had done a pat down of Ramos which detected no weapons. Moreover, Kobayashi denied that a knife was involved in the argument and refused to make a complaint. Kobayashi told the officers that everything was all right.

Having completed his investigation of the dispatch report, and seeing that Ramos was calm, Sgt. Costa ordered Officer Hood to remove the handcuffs. Ramos had most likely been handcuffed for the duration of the investigation, about ten to eighteen minutes.[4]

The police investigation was reasonably thorough, given the relatively circumscribed dispatch report, premises and people involved or at hand. Ten to eighteen minutes is ample time in which to accomplish such a reasonably thorough investigation.

Once the investigation turned up no knife, no complainant and no evidence of the reported crime, and Sgt. Costa had ordered the handcuffs removed, the constitutional part of the seizure ended because the police had "failed to substantiate the reasonable suspicion that initially justified" the initial stop. *Silva,* 91 Hawai'i at 81, 979 P.2d at 1107. Having dispelled the initial reasonable suspicion, under *Silva* the police lacked any constitutional justification to further detain Ramos.

At this point, however, Officer Hood remained literally in Ramos' face and demanded identification, and thus detained Ramos longer than was necessary to effectuate the purpose of the stop.

While the initial seizure was justified, once the police officers determined that no weapon

---

4. In light of the record, finding of fact (FOF) 6—that the handcuffs had been on Defendant–Appellant Saul N. Ramos (Ramos) for approximately thirty seconds—is clearly erroneous. Although there was substantial evidence in support of this FOF (Officer Raphael Aguilar Hood's testimony that Ramos was handcuffed for about thirty seconds), given the undisputed testimony about the several steps involved in the investigation, we are left with a definite and firm conviction that the trial court was mistaken.

was involved and no one wanted to make a complaint, and thus dispelled the reasonable suspicion that justified the initial seizure, Ramos should have been released. By further detaining Ramos, Officer Hood subjected him to an illegal seizure.

In defense of the continuing detention, the State argues that it was merely "part of a more thorough investigation." The State points to Sgt. Costa's testimony that identifying the parties involved is part of a complete investigation, particularly in a case like this one:

> Q. [PROSECUTOR]. Okay. In a standard investigation of a case involving a confrontation between two individuals, do you have specific operating procedures which require you to I.D. both parties as part of your investigation?
>
> A. [COSTA]. Well, that's part of trying to do a complete investigation, trying to get, you know, identification, especially in a case of this type where there possibly was a weapon involved, although we couldn't determine if there was a weapon involved. So get identification to all parties involved.
>
> Q. [PROSECUTOR] Mm-hm. Okay. Why is it important to get identification of the parties involved?
>
> A. [COSTA]. So if anything happens further on, at least we know who was involved at the time. And possibly to check, see if any—what type of record this person has, and also to check if there's any outstanding warrants, anyone of the party.

Warrant checks, record checks and dossiers on "the usual suspects" certainly constitute prudent police work. But if performed during an illegal seizure, such measures, no matter how laudable, are simply unconstitutional.

Moreover, the interests of a "more thorough investigation" cannot serve as the basis for an exception to the prohibition against warrantless searches and seizures. A "more thorough investigation" is potentially without temporal limit and certainly without conceptual limit germane to the constitutional interests protected by the prohibition.

Once the police investigation had dispelled the initial reasonable suspicion, the situation was analogous to one in which a police officer and a citizen pass each other on the street without a whiff of criminal activity afoot. Under such circumstances, it cannot be argued that a detention of the citizen by the police and a demand for identification would be constitutionally defensible. *See Quino,* 74 Haw. at 175–76, 840 P.2d at 365 ("We cannot allow the police to randomly 'encounter' individuals without any objective basis for suspecting them of misconduct and then place them in a coercive environment in order to develop reasonable suspicion to justify their detention.").

In support of its position, the State cites two cases which it asserts allow the police to briefly detain citizens and demand identification from them as a reasonable adjunct to an investigation. In both cases, however, the initial detention was justified by reasonable suspicion and the demand for identification was made while the reasonable suspicion was still extant. Indeed, in both cases reasonable suspicion eventually ripened into probable cause for arrest. *United States v. Jones,* 759 F.2d 633, 635 (8th Cir.1985) (police request for identification was made at the outset of an investigative stop based upon reasonable suspicion; eventually a pistol was discovered); *State v. Flynn,* 92 Wis.2d 427, 285 N.W.2d 710, 712 (1979) (police request for identification was their first action during an investigative stop based upon reasonable suspicion; identification resulted in the discovery of a " 'pick-up' order" on the defendant).

The State's assertion also begs the question why the police did not determine Ramos' identity until after they apparently felt comfortable enough with him and the situation to remove the handcuffs. This circumstance also belies the State's other argument that the police officers retained reasonable suspicion at the time of the further detention and demand for identification. It took some prompting on the part of the prosecuting attorney to elicit Sgt. Costa's testimony to that effect:

> Q. [PROSECUTOR]. Okay. Is part of the reason because, too, that if you found out from checking his identification that he was a very dangerous individual, that that might be an additional piece of evidence

that you would take into account in your investigation?

A. [COSTA]. Sure we would.

In support of this argument, the State also points to Sgt. Costa's testimony that, at the time of the further detention, he had not completely ruled out the possibility of a knife. The State also relies upon Sgt. Costa's professed experience with situations in which a weapon not initially found is later uncovered by a more thorough search. Summing up this argument, the State concludes that "[t]hus, it is clear that in Costa's mind, the investigation had not yet been completed."

We observe, in addition, that there was evidence of Ramos' odd demeanor and behavior during the further detention, which alarmed Officer Hood, who felt that his pat down of Ramos may not have been thorough. Officer Hood also testified to his impression at the time that "there was something wrong with this guy."

▮▮▮ The problem with this argument is that the relevant focus is not the subjective impressions of the police officers. What is constitutionally critical is an objectively reasonable assessment of the situation. The Hawai'i Supreme Court has held that:

> an intrusion upon personal liberty must be reasonable and be based on something more substantial than inarticulate hunches, and that reasonableness is to be judged by an objective standard, namely, whether the facts known by the officer would warrant a [person] of reasonable caution to believe that the action taken was appropriate.

*State v. Goudy*, 52 Haw. 497, 501, 479 P.2d 800, 803 (1971). *See also Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679 ("[t]he ultimate test ... [is] measured by an objective standard").

Simply put, an objective assessment of the situation at the point of time in question clearly indicates that the police had thoroughly investigated the dispatch report and, concluding it was without criminal substance, should have released their initial suspect.

It is difficult to credit Officer Hood's impression that Ramos might still have been armed and presently dangerous after the handcuffs were removed. Officer Hood had done a pat down of Ramos after handcuffing him. If that pat down was indeed a cursory one—despite the dispatch report of an armed and potentially violent altercation—then Officer Hood had ample further opportunity to preclude the possibility of danger during the ten to eighteen minutes Ramos was handcuffed.

Under such circumstances, viewed objectively, a person of reasonable caution would conclude that the further detention and interrogation were illegal.

The State's final argument seems to urge that the prolonged detention and interrogation were justified by reasonable suspicion of other crimes that might have been committed. In the State's words, "[d]epending on the extent and duration of the chasing, and the words and gestures used while the chasing occurred, [Ramos] could have committed the following: Disorderly Conduct ...; Harassment ...; Terroristic threatening ...; or an attempted Assault[.]"

By referring to contingencies not in the record and clearly not within the ken of the police at any time in their encounter with Ramos, the State betrays its lack of "specific and articulable facts" underlying such other crimes required to justify the further detention and interrogation. *Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679.

## IV. Conclusion.

With respect to the trial court's FsOF and CsOL, we have already indicated, *supra*, n. 4, that FOF 6 is incorrect. In light of the foregoing discussion, we conclude that the trial court's use of the adjective "quick" in FOF 4 has little relevant context and is thus immaterial to the disposition of the relevant issues in this case.

With respect to the trial court's COL 15, the conclusions that "the police acted reasonably" and that their request for identification "was a reasonable continuation of their investigation" are not conclusions sufficient for a properly informed ruling on the motion to suppress.

The general concept of "reasonableness," in and of itself and not rooted in any consti-

tutionally relevant inquiry, lacks the proper conceptual ground upon which a court can place appropriate limits on police activity. *See, e.g., In Interest of Doe,* 77 Hawai'i 435, 439, 887 P.2d 645, 649 (1994)("the determination of the standard of reasonableness governing any specific class of searches [or seizures] requires balancing the need to search [or seize] against the invasion which the search or seizure entails")(internal quotation marks and citation omitted).

In this case, the appropriate inquiry for the trial court was whether the further detention and interrogation of Ramos occurred after the point at which the police investigation had extinguished the reasonable suspicion which justified the initial investigative stop. *Silva,* 91 Hawai'i at 81, 979 P.2d at 1107.

We conclude that the trial court used an incorrect standard of decision in arriving at COL 15. In any event, our discussion of the case indicates that COL 15, which was in essence the trial court's ruling on Ramos' motion to suppress, is wrong. In so concluding, we are guided by principles established long ago by the Hawai'i Supreme Court:

> In our view, the right to be free of "unreasonable" searches and seizures under article, I, section 5 [now section 7] of the Hawaii Constitution is enforceable by a rule of reason which requires that governmental intrusions into the personal privacy of citizens of this State be *no greater in intensity than absolutely necessary under the circumstances.*

*Kaluna,* 55 Haw. at 369, 520 P.2d at 58–59 (footnote omitted, emphasis added).

In conclusion, therefore, and based upon article I, section 7 of the Hawai'i State Constitution, the further detention and interrogation of Ramos was unlawful, and any evidence seized as a result should have been suppressed. *See, e.g., Kachanian,* 78 Hawai'i at 483, 896 P.2d at 939 (where the seizure was unconstitutional, "all the evidence which was the product of the seizure should have been suppressed from use at trial").

## V. Disposition.

Because the State has no evidence upon which to convict Ramos of promoting a dangerous drug in the third degree, other than the evidence which should have been suppressed, we vacate the November 9, 1998 judgment of conviction and sentence and remand for entry of an order dismissing the charge against him, with prejudice. *Kearns,* 75 Haw. at 572–73, 867 P.2d at 910.