896 P.2d 931

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Jack Brian KACHANIAN,
Defendant–Appellant.**

No. 16518.

Intermediate Court of Appeals of Hawai'i.

May 16, 1995.

Anthony L. Ranken, Wailuku, Maui, for defendant-appellant.

Mark R. Simonds (Robert K. Kekuna, with him on the brief), Deputy Pros. Attys., County of Maui, Wailuku, Maui, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

Defendant–Appellant Jack Brian Kachanian (Defendant) was convicted of Promoting a Dangerous Drug in the First Degree in violation of Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i) (Supp.1992) (Count I) and of Resisting Arrest in violation of HRS § 710–1026(1) (1985) (Count III) in Criminal No. 92–0025. He was also convicted of Promoting a Dangerous Drug in the Third Degree in violation of HRS § 712–1243(1) (1985) (Count I) and of Promoting a Harmful Drug in the Fourth Degree in violation of HRS § 712–1246.5(1) (Supp.1992) (Count III)[1] in Criminal No. 92–0063. The convictions followed a consolidated jury-waived trial on written stipulated facts. "Pursuant to a plea agreement[,]" the State of Hawai'i (the State) dismissed the charges of prohibited acts related to drug paraphernalia (Count II in both cases). Under the judgments entered on August 5, 1992, Defendant was sentenced to probation for five years on the Count I offenses and for one year on the Count III offenses in each case, all sentences to run concurrently. As a term of his probation, Defendant was ordered to perform three hundred hours of community service.

Defendant appeals from the judgments. His points on appeal relate only to claimed errors in the denial of his motions to suppress filed on March 11, 1992 in Criminal No. 92–0025 and on May 22, 1992 in Criminal No. 92–0063.

For the reasons stated herein, we (1) reverse the order denying the motion to suppress and the judgment of conviction on Count I and affirm the judgment of conviction on Count III of Criminal No. 92–0025 and (2) reverse the judgment in Criminal No. 92–0063.

## I.

### A.

In his amended opening brief, Defendant states that "[n]o factual findings of the trial court are contested in this appeal; therefore ... only questions of law.... [which] are freely reviewable on appeal" are presented. On the other hand, the State "disagrees with [Defendant's] assertion that all that is before this Court are questions of law[,]" but only because of its contention that the issue before this Court is whether Defendant abandoned the evidence in Count I of Criminal No. 92–0025 and that abandonment is a question of fact. The State apparently does not otherwise contest the findings of fact. We conclude, therefore, that the facts are largely undisputed.

### B.

The pertinent findings of fact in Criminal No. 92–0025, stipulated facts entered in Defendant's consolidated jury-waived trial, and videotaped transcript recount the following events.

On January 21, 1992, Officer George Kronoski (Officer Kronoski) of the Maui Police Department received information from Major Tom Phillips (Major Phillips) that Defendant was taking over a heroin distribution operation on the island of Maui from a party who Officer Kronoski had previously arrested for heroin possession. Major Phillips also informed Officer Kronoski that Defendant might be arriving that evening from Honolu-

---

1. The judgment incorrectly states that in Criminal No. 92–0063, Defendant was "CONVICTED AND FOUND GUILTY OF ... PROMOTING A HARMFUL DRUG IN THE FOURTH DEGREE in Count 2." The sentence of the court correctly states that the judgment and sentence related to "Count 3." Since neither party raised this error, we proceed on the assumption that the reference to "Count 2" was a typographical error.

lu and might be carrying heroin. There was no indication as to Major Phillips' source for this information about Defendant. Officer Kronoski knew Defendant from previous encounters, because Defendant had tried to sell a solar water heating system to him. Defendant knew Officer Kronoski was a police officer.

The information was relayed by Officer Kronoski to Sergeant Richard Camara (Sergeant Camara), Officer Frank Gonzalez (Officer Gonzalez), and Officer Mark Joaquin (Officer Joaquin). The four officers went to the airport to meet the evening Aloha Island Air flights from Honolulu. There were two incoming flights that evening.

On January 22, 1992, at 12:45 a.m., Aloha Island Air flight number 1801 arrived at the Kahului Airport. The four officers observed Defendant disembark at 12:45 a.m. Defendant came near Officer Kronoski. Officer Kronoski attempted to talk to Defendant but Defendant made a motion with his hand near his ear and continued walking at a fast pace. Officer Kronoski followed Defendant. Officer Gonzalez saw that Defendant was almost running. Officer Gonzalez pursued Defendant and passed Officer Kronoski and Sergeant Camara. Officer Kronoski went to get his car in order to pursue Defendant.

Officer Gonzalez caught up with Defendant in front of the car rental ticket booth area. Running alongside Defendant's right side, Officer Gonzalez displayed his badge and identified himself as a police officer. Twice, he asked to speak with Defendant. Defendant responded that he could not hear, that his ears hurt, and that he wanted to go home. Officer Gonzalez stopped Defendant by positioning himself in front of Defendant. Defendant stopped and sat down on a cement bench at the car rental ticket booth.

Sergeant Camara caught up with Defendant at the same time as Officer Gonzalez. Sergeant Camara told Defendant that the police had information that Defendant might have narcotics and that they were going to detain Defendant's brown hand-carry shoulder bag for narcotic canine screening.

Officer Gonzalez asked Defendant for his airline ticket. Defendant said he had left the ticket on the plane. Officer Gonzalez asked Defendant for identification. Defendant produced identification but because his hands were shaking, he had difficulty doing so. Officer Gonzalez then asked Defendant if he had any drugs on him. Defendant said "no." Defendant also told Officer Gonzalez that if he wanted the brown shoulder bag, he could have it.[2] Defendant gave the bag to Officer Gonzalez.

Officer Gonzalez left to take the bag to the narcotics detection dog. Officer Joaquin and Sergeant Camara[3] arrived as Officer Gonzalez left with Defendant's bag. Defendant walked away. Officer Joaquin and Sergeant Camara followed Defendant at a distance.

Defendant proceeded toward the main terminal through a covered walkway. He stopped at a telephone booth and called a person named Jim. After finishing his telephone call, Defendant turned to Officer Joaquin and Sergeant Camara and asked them why they were following him. They did not answer. Defendant proceeded in the direction of 'Iao Valley, towards the main terminal. Sergeant Camara received a page on his digital pager and left to return the call. The number on the pager was the telephone number of the Vice Narcotics Office. No one answered the telephone at the office. Although normally "straight numbers" were

2. Defendant testified at the hearing on the motion to suppress in Criminal No. 92–0025 that the officer told him he could not leave without the police going through his bag. He told the officer that "you can't do that." When he received no response, he told the officer that he could keep the bag and then left.

3. The court's findings of fact on the motion to suppress have Sergeant Richard Camara (Sergeant Camara) arriving at Defendant's location twice. Officer Mark Joaquin (Officer Joaquin) testified at the motion to suppress hearing that

he saw Officer Frank Gonzalez (Officer Gonzalez) and Sergeant Camara by Defendant when he arrived. Sergeant Camara's testimony indicates that he was present when Officer Gonzalez was speaking with Defendant prior to taking Defendant's bag. However, Officer Gonzalez initially testified that when he spoke with Defendant, he did not know where Sergeant Camara was. Later in his testimony, Officer Gonzalez testified that Sergeant Camara was with him when he asked Defendant for his identification.

used as a signal and he did not know who sent the page, Sergeant Camara understood the page as a signal that the canine had "alerted" to the bag. He later learned that Officer Gonzalez had paged him.[4]

Officer Joaquin continued to follow Defendant. He hid behind a pillar so that he could peek around it and observe Defendant without being seen by Defendant. Officer Joaquin saw Defendant simultaneously sit on a bench at the curbside and remove his left hand from the front pocket of his sweatshirt. Defendant threw a white object into the planter of bushes directly behind him. At that time, Officer Joaquin walked toward Defendant and told him that he wanted to talk to him. He asked Defendant what he had thrown into the bushes. As the officer approached, Defendant stood up and began to walk away. He then turned, looked at the officer, and said he had not thrown anything into the bushes.

Officer Joaquin believed he had probable cause to place Defendant under arrest because he had seen Defendant discard an object into the bushes, received information regarding the possibility of Defendant transporting heroin from Honolulu to Maui, heard Defendant deny having possession of drugs, and observed Defendant avoid the police from the time he arrived on Maui.

Officer Joaquin ran after Defendant, physically detained him and advised him that he was under arrest. Defendant began swinging and kicking at the officer.[5] Officer Joaquin and Defendant rolled on the ground while the officer attempted to subdue Defendant. Sergeant Camara, and then Officer Gonzalez, arrived and assisted Officer Joaquin in restraining Defendant.

After controlling Defendant, Officer Joaquin returned to the bushes where he had seen Defendant throw the white object. He searched the bushes and recovered something wrapped in a white piece of tissue paper.

With no objection from Defendant, Officer Joaquin opened the tissue paper and found two homemade plastic packets. He held the packets up to the light. He suspected they contained black tar heroin.

After recovering the packets from the bushes, Officer Joaquin returned to Defendant and conducted a pat down search incident to arrest. He seized a plastic packet which he suspected contained black tar heroin from the front coin pocket of Defendant's jeans.

Field tests and chemical analyses of the substances recovered from the plastic packets found in the tissue and on Defendant's person confirmed that the substances were black tar heroin. A forensic chemist determined the heroin had a gross weight of 29.97 grams but he was unable to extract all of the substance from the packets.[6]

The dog "alerted" to Defendant's bag. However, narcotics were not found in the bag. There is no finding of whether this specific information was conveyed to the officers or when Officer Gonzalez determined there were no narcotics in the bag. However, Sergeant Camara's testimony indicates that when Officer Joaquin arrested Defendant, Officer Joaquin did not have this information.[7]

On January 27, 1992, a Grand Jury Indictment was filed in Criminal No. 92–0025 against Defendant for Promoting a Dangerous Drug in the First Degree (Count I), Prohibited Acts Related to Drug Paraphernalia (Count II), and Resisting Arrest (Count III).

---

4. The facts regarding the page were obtained from the video transcript of the hearing on the motion to suppress in Criminal No. 92–0025.

5. The facts regarding Defendant resisting arrest are from the Stipulated Facts submitted at trial.

6. The facts concerning the nature and weight of the substances are from the Stipulated Facts at trial.

7. Obviously, this information offered no basis for arresting or detaining Defendant. Sergeant Camara's testimony at the motion to suppress hearing indicates that after he made the telephone call in response to the page, he returned to see Officer Joaquin subduing Defendant. Thus, apparently at the time Officer Joaquin arrested Defendant, he did not know the results of the "canine screening."

On January 31, 1992, at approximately 1:15 p.m., three officers executed a grand jury bench warrant on Defendant in connection with Criminal No. 92–0025. The search incident to this arrest resulted in the recovery of two plastic syringes from Defendant's left front trousers pocket, two small plastic bags containing a substance believed to be black tar heroin taken from Defendant's right rear trousers pocket, and three pills from Defendant's right front coin pocket. Two of the three pills were Tylenol # 4 which is a controlled substance. None of the pills were in a prescription container. Defendant did not have a prescription in his possession at the time of his arrest.

Defendant was arrested again. The substance suspected to be black tar heroin was confirmed as such and found to have a gross weight of 2.2 grams.

On February 14, 1992, a Grand Jury Indictment was filed in Criminal No. 92–0063 against Defendant for Promoting a Dangerous Drug in the Third Degree (Count I), Prohibited Acts Related to Drug Paraphernalia (Count II), and Promoting a Harmful Drug in the Fourth Degree (Count III).

## II.

### A.

Defendant's essential position is that "the initial stop and seizure of his shoulder bag[8] [on January 21, 1992] violated the Fourth Amendment, and all the subsequent events ... were the fruit [sic] of that initial unconstitutional encounter." In opposition, the State asserts that Defendant "was not seized at the time he threw the heroin away; [he] was merely under surveillance."

Initially, we expressly affirm that our determination of this case does not rest on the Fourth Amendment to the United States Constitution. We rely, rather, on our jurisdiction's application of article I, section 7 of the Hawai'i Constitution, which states in pertinent part that, "[t]he right of the people to be secure in their persons ... against unrea-

sonable searches, seizures and invasions of privacy shall not be violated[.]" Our application of article I, section 7 constitutes a "bona fide separate, adequate, and independent [state constitutional] ground[ ]," for decision which is not subject to review by the United States Supreme Court. *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983). For, this jurisdiction has "not hesitated in the past to extend the protections of the Hawai'i [Hawai'i] Bill of Rights beyond those of textually parallel provisions in the Federal Bill of Rights when logic and a sound regard for the purposes of those protections have so warranted." *State v. Kaluna*, 55 Haw. 361, 369, 520 P.2d 51, 58 (1974). The federal system tolerates the "divergence of meaning between [the same] words ... in both the federal and state constitutions, ... where the result is *greater* protection of individual rights under state law than under federal law." *Id.* at 369 n. 6, 520 P.2d at 58 n. 6 (emphasis in original).

### B.

■ The circuit court properly concluded that at the time Officer Gonzalez "positioned himself in front of the Defendant in order to stop him," "the police officers lacked the necessary grounds for an investigatory stop of Defendant." Up to that point, the officers knew only that an unknown person had transmitted information that Defendant "might have heroin in his possession."

■ Furthermore, to justify an investigative stop, the police officer must point to specific and articulable facts, which, taken together with rational inferences from the facts, indicate to a prudent and cautious person that criminal activity was afoot. *State v. Melear*, 63 Haw. 488, 493, 630 P.2d 619, 624 (1981). There were no specific facts here which would warrant a prudent and cautious person to believe criminal activity was afoot in view of the fact that the only information the police had was an anonymous tip that

---

8. Because neither the bag nor its contents constituted evidence against Defendant, the bag is relevant only to the extent the police maintained coverage of Defendant until they could complete a "canine screening" and examination of its contents. What is determinative is whether Defendant was illegally seized.

Defendant "might have heroin in his possession."

## C.

■ However, this jurisdiction has not altogether precluded a warrantless seizure in the absence of reasonable suspicion, if the seizure is consented to by the person stopped. *State v. Kearns,* 75 Haw. 558, 569, 867 P.2d 903, 908 (1994). In that regard, our supreme court has held that, "a person is seized, for purposes of article I, section 7 of the Hawai'i Constitution, when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information." *Id.* at 567, 867 P.2d at 907. It is not disputed that the police approached Defendant for the express purpose of investigating Defendant for heroin possession or trafficking, and that they attempted to speak with Defendant more than once. Once the officers approached Defendant and began to ask him questions in furtherance of their investigation, Defendant was effectively restrained. There can be no doubt, then, that Defendant was seized in the constitutional sense, at the very least, at this point.[9] *Id.*

■ Defendant, obviously, did not consent to the seizure. Defendant would not stop when approached by the officers. He was "pursued" by Officer Kronoski and "chase[d]" by Officer Gonzalez who "ran along[side]" Defendant. Indeed, when Officer Gonzalez asked Defendant if he could speak to him, Defendant responded, in part, "that he just wanted to go home." Finally, Officer Gonzalez had to "position[ ] himself in front of the Defendant in order to stop him." It was only then that "Defendant stopped walking[.]"

The Hawai'i Supreme Court has said that, "[a]n individual's 'consent' must, of course, be given *prior to the seizure* [,]" because "[m]ost seizures . . . occur at the inception of interaction between the police and the individual." *Kearns,* 75 Haw. at 569 n. 5, 867 P.2d at 908

n. 5 (emphasis added). But, "there is virtually no way that the individual could consent prior to the seizure." *Id.* Thus, consent to seizure is at best problematical. Our supreme court has accordingly declared that "the consent exception to the warrant requirement will *rarely* be applicable." *Id.* (emphasis added). Manifestly, here, Defendant did not consent, at any time, to the seizure.

After the police stopped Defendant, Sergeant Camara informed Defendant that he was the subject of an investigation for narcotics possession and "that the officers were going to detain Defendant's hand-carried brown shoulder bag for narcotic canine screening." Again, the circuit court properly concluded that when "Sergeant Camara announced that he would be seizing Defendant's shoulder bag, the police officers lacked the necessary grounds for a seizure of the bag." The police had no information at all that the shoulder bag contained any narcotics, and its seizure was clearly illegal.

Defendant was then interrogated by Officer Gonzalez about his airline ticket, destination, and whether "he had any narcotics[.]" Defendant then told Officer Gonzalez that if he wanted the brown shoulder bag, he could have it.[10] While nothing was seized from the bag, we note that Defendant's statement in the face of the already stated intention of the police to seize the bag, did not amount to a constitutionally valid consent to a search and seizure of the bag. *Cf. Kearns* (acquiescence in and of itself is insufficient to establish consent under the circumstances of a nonconsensual seizure).

The Hawai'i Supreme Court in *Kearns* indicated that "an investigative encounter can only be deemed 'consensual' if (1) prior to the start of questioning, the person encountered was informed that he or she had the right to decline to participate in the encounter and could leave at any time, *and* (2) the person thereafter voluntarily participated in the en-

---

9. Arguably, Defendant was seized when Officer Gonzalez stepped in front of Defendant, but there is no doubt that he was seized when the police began questioning him.

10. See Defendant's testimony set forth in note 2, *supra,* page 478.

counter." *Id.* at 571, 867 P.2d at 909 (emphasis added).

It is undisputed that the police never informed Defendant of his right to decline to participate in the encounter. Furthermore, the facts leave no doubt that Defendant did not "voluntarily participate" in the encounter. If either condition is not met, Defendant "could not have 'consented' to the seizure." *Id.* at 572, 867 P.2d at 909. It follows, then, that the seizure was illegal.

As in *Kearns*, "[t]herefore, all evidence obtained as a result of [the officer's] 'encounter' with [Defendant] was illegally obtained and should have been suppressed." *Id.*

### D.

■ Ostensibly, this case presents the additional question of whether Defendant was still "seized" under the Hawai'i Constitution after he walked away but was followed by two officers and, subsequently, one officer.

The circumstances show that the "investigatory encounter" continued and, hence, that the illegal seizure continued. Under article I, section 7 of the Hawai'i Constitution, a "seizure" does not require "physical force or submission to an assertion of authority." *State v. Quino*, 74 Haw. 161, 169–70, 840 P.2d 358, 362, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993). The "test ... of ... [whether] a person is seized [is] if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave." *Kearns*, 75 Haw. at 566, 867 P.2d at 907. The test is applied under "an objective standard" and the trial court's determination of whether a seizure has occurred is reviewed by the appellate court "*de novo.*" *Id.* We conclude, applying the objective standard *de novo*, that a reasonable person under the totality of the circumstances, would have believed he or she was not free to leave.

### E.

We review, then, the circumstances which draw us to the conclusion that a reasonable person in Defendant's position would believe that he or she was not free to leave.

Defendant did testify that he was afraid of being arrested and he knew he would not be allowed to leave without being arrested. However, as indicated previously, the standard we must apply is an objective one based on what a reasonable person in the circumstances Defendant found himself would have believed.

Here, police officers had pursued Defendant through the airport. They had stopped and detained him, although he indicated he did not want to stop or converse with them and that he wanted to go home. By their statements, questions, and actions, the police made it clear that Defendant was the focus of a narcotics investigation. He was told that his shoulder bag was to be detained and to be subjected to a "canine screening" for drugs. After the bag was taken away for a canine sniff, Defendant apparently walked away from the officers. But he was not let alone but was followed by two of the police officers who had been chasing him. Consequently, Defendant was not allowed to walk away freely. Instead, he was trailed by two of the officers, pending completion of the canine sniff. Although asked by Defendant, the two officers refused to tell him why they were following him. When one of the officers left in response to the pager signal regarding the canine sniff, the other officer continued to follow Defendant. Thus, the securing of Defendant's movements was a continuation of the officers' narcotics investigation and, accordingly, a continuation of the initial illegal seizure. Quite simply, the police did not choose to terminate the encounter.

It was at this point that Defendant, believing himself to be out of the view of the police, threw a white object "into the planter area of bushes[.]" At this time, Defendant had not yet reached the main terminal of the airport. His bag had not been returned to him, he knew it had been taken away for a canine screening, he had not been advised by police when he would get his bag back, and he was aware that he was being followed by police officers. Under these circumstances, a reasonable person would believe that the narcotics investigation had not yet been completed

and that he or she would not be free to leave until it was completed.

The fact that Defendant could not see the officer when he threw the tissue into the planter is not a circumstance which in and of itself would establish a reasonable person's belief that he or she was free to leave, in light of all the other circumstances. Rather, Defendant's attempt to rid himself of the heroin as soon as he believed he was not in the view of a police officer was consistent with, and not contrary to, a belief that he would not be allowed to leave the airport until the police had completed their investigation to their satisfaction. If Defendant believed he was free to leave and was not subject to further detention, he would have had no reason to rid himself of the incriminating evidence at the point that he did.

At no time did the officers indicate to Defendant that he would be allowed to leave before they completed their investigation. Indeed, their actions indicated otherwise. While not controlling in the application of the objective standard, the evidence at the hearing indicated that the police, as a matter of fact, never relinquished coverage of Defendant pending determination of the "canine screening[.]" The facts here indicate the police were not merely keeping Defendant "under surveillance," but securing his movements for the purpose of completing their investigation, i.e., until the police received the results of the canine screening. Clearly, as far as the police were concerned, Defendant would not have been allowed to leave until the "screening" had been concluded. That the absence of probable cause to arrest, the lack of reasonable suspicion justifying a stop, and the want of consent by Defendant to the police "encounter" did not and had not deterred the police from keeping Defendant on an investigatory tether in their singular pursuit of him, substantiates Defendant's reasonable belief that he was not free to leave.

We hold, therefore, that in situations such as this, where Defendant was the focus of a narcotics investigation, was "seized" illegally, had his bag detained for a "canine [narcotics] screening[,]" and had his subsequent movements secured by the police pending comple-

tion of the screening, a reasonable person would believe that he or she was not free to leave.

■ In other words, a seizure is not terminated until a reasonable person in Defendant's situation would believe, under the totality of the circumstances, that he or she was free to leave.

Applying the objective standard, then, Defendant was not free to leave at the time he threw a white object into the planter area. At that point, he was still "seized" within the meaning of article I, section 7 of the Hawai'i Constitution and the packets obtained from the planter area and subsequently from Defendant's person were the fruits of this seizure.

■ Because he was initially seized without probable cause, without reasonable suspicion, and without his consent, the seizure violated the reasonable seizure requirement in article I, section 7 of the Hawai'i Constitution. *State v. Kearns,* 75 Haw. 558, 867 P.2d 903 (1994); *State v. Quino,* 74 Haw. 161, 840 P.2d 358, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992), *cert. denied,* — U.S. —, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993). As a result, all the evidence which was the product of the seizure should have been suppressed from use at trial.

This case is similar to *Quino.* There, the defendant was stopped and questioned by police at the Honolulu airport. The defendant ran from the police "with the officers in pursuit." *Quino,* 74 Haw. at 166, 840 P.2d at 361. During the chase, the defendant "drop[ped] a cellophane package [containing illegal drugs] into a potted plant as he ran." *Id.* The Hawai'i Supreme Court held, as we do here, that "[u]nder the circumstances ... [the defendant] did not voluntarily and intelligently agree to be [initially] detained." *Id.* at 175, 840 P.2d at 364. Quino contended that there was a resulting "unlawful and nonconsensual seizure of his person in violation of both the Fourth Amendment of the United States Constitution and article I, section 7 of the Hawai'i [Hawai'i] Constitution." *Id.* at 168, 840 P.2d at 361 (footnotes omitted). The Hawai'i Supreme Court agreed with this proposition and held, accordingly,

"that the incriminating evidence obtained after he fled was inadmissible as the product of an illegal seizure." *Id.* at 168, 840 P.2d at 362. Further, it "conclude[d] that [because] an unlawful seizure occurred prior to Quino's flight, it is unnecessary to address" the issues of "whether Quino was 'seized' when the police officers pursued him as he ran through the airport terminal ... [and] whether Quino had a reasonable expectation of privacy in the contraband he abandoned[.]" *Id.* at 163 & n. 1, 840 P.2d at 359 & n. 1.

Likewise, we deem it unnecessary to discuss similar issues here. The evidence recovered was the product of an initial illegal seizure, as it was in *Quino.* Moreover, here, Defendant threw contraband into a planter while still unconstitutionally "seized." Insofar as his walk away from the police may be considered "flight," suppression of the contraband is still required under *Quino.*

### F.

■ There is a further, independent ground for suppressing the packet obtained from the search of Defendant's person. Officer Joaquin lacked probable cause to arrest Defendant after he was seen throwing a white object into the nearby planter area. The contents of the white object were not open to view, and the officer had no information indicating that the white object contained contraband. An arrest of Defendant at that point, therefore, was illegal. It was only after Defendant was arrested that the officer recovered the white object and observed what he believed to be packets of black tar heroin wrapped in a white tissue. It is axiomatic that the subsequent discovery of contraband cannot justify a prior illegal arrest. *See State v. Kim,* 68 Haw. 286, 291, 711 P.2d 1291, 1294 (1985) ("invalid search or seizure is not subsequently validated by what it produces").

Because the arrest was illegal, the search incident to the arrest was tainted, and the packet recovered in a search of Defendant's pockets should have been suppressed.

■ However, the State contends that after recovering the black tar heroin from the planter, the police had the basis for conducting an investigatory stop. Aside from the fact that there is no evidence that the police made an investigatory stop as opposed to an arrest, a search incident to an investigatory stop is limited to a pat down search for weapons. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). There is nothing in the record to suggest that the search here was limited to a "pat down" of Defendant's outer clothing for weapons, or that the packet recovered could be mistaken for a weapon. Thus, the search producing the packet exceeded the permissible scope of a search incident to an investigatory stop.

Finally, if the search were incident to an arrest for resisting arrest, obviously, the packet in Defendant's pocket, again, could not be mistaken for a weapon or an instrumentality of escape. Nor could it be considered evidence of the crime of resisting arrest. The record, rather, indicates the arrest was for possession of the packets recovered from the planter.[11]

### G.

Accordingly, we reverse the order denying the motion to suppress the two packets recovered from the planter area and the packet recovered from Defendant's pocket in the search conducted incident to the illegal arrest.

Inasmuch as the three packets were the only evidence supporting Count I in Criminal No. 92–0025, we also reverse the judgment entered on Count I in Criminal No. 92–0025.

### III.

We note at the outset that no points on appeal are raised with respect to the conviction for resisting arrest, Count III, in Criminal No. 92–0025. Moreover, Defendant stipulated to facts at trial which would support

---

11. At the hearing on the motion to suppress, Officer Joaquin testified that after he arrested Defendant, he picked up the packets Defendant threw into the planter area and then "clarified"

that Defendant was being arrested for possession of black tar heroin. No mention was made of Defendant being arrested for resisting arrest.

the conviction.[12]  Accordingly, the judgment as to Count III in Criminal No. 92–0025 is affirmed.  However, the charge of resisting arrest, did play a role in Criminal No. 92–0063, as we indicate below.

## IV.

### A.

Defendant's sole contention on appeal with respect to the drug charges in Criminal No. 92–0063 is that the "items seized from [Defendant's] person [at his arrest on the grand jury bench warrant for Criminal No. 92–0025] were tainted by the illegality of the prior airport seizure." This proposition was the basis for Defendant's motion filed on May 22, 1992, to suppress the drugs at issue in Criminal No. 92–0063.  On May 27, 1992, the court orally denied this motion to suppress and the order was filed on June 3, 1992.  No findings of fact or conclusions of law were requested or filed for this motion, nor do the reasons supporting the order appear in the record.

Although we hold that the seizure of Defendant at the airport was illegal, we point out that the indictment in Criminal No. 92–0025 charged "resisting arrest," in addition to the drug offenses.  That charge would not be affected by any illegality of the seizure or of the subsequent arrest.  The illegality of the seizure or arrest would not preclude conviction on the resisting arrest charge under the rationale we discuss herein.  We revisit Criminal No. 92–0025 to explain our reasoning.

### B.

Count III of the indictment in Criminal No. 92–0025 charged Defendant with "intentionally prevent[ing] a peace officer acting under color of his official authority from effecting an arrest by using or threatening to use physical force against the peace officer ... in violation of Section 710–1026(1) of the Hawai'i [Hawai'i] Revised Statutes." [13]  Assuming, as we have held, that the initial seizure of Defendant and his subsequent arrest on January 22, 1992 were illegal, such illegality would not affect the "resisting arrest" charge.  That is because under HRS § 710–1026, "it is no defense to [the crime of resisting arrest] ... that the officer was making an unlawful arrest, provided he [or she] was acting under color of law."  Commentary to HRS § 710–1026 (1985).  This is in accord with "American jurisdictions [which] have almost universally rejected the common-law doctrine that it is permissible to resist an unlawful arrest with as much force as one has[.]"  *Id.*  The policy underlying the statute requires that the lawfulness of an arrest be resolved in the courts because, "the evils involved in allowing such resistance far outweigh the infrequent and usually minor inconvenience of submitting to any arrest made under color of law and disputing it within the legal framework."  *Id.*  As a result, despite the illegality of the prior seizure or the arrest, Defendant was not privileged

---

12.  As to the resisting arrest charge, Defendant stipulated to the following:

13.  That Officer Joaquin ran after the Defendant, physically detained him, and advised him that he was under arrest.

14.  That the Defendant, after being advised he was under arrest, began to swing and kick at Officer Joaquin.  That Officer Joaquin and the Defendant ended up rolling around on the ground with Officer Joaquin attempting to subdue the Defendant.

15.  That Sergeant Camara arrived at Officer Joaquin's location while Officer Joaquin was attempting to subdue the Defendant and assisted Officer Joaquin.

16.  That subsequently Officer Gonzalez arrived at Officer Joaquin's and Sergeant Camara's location and between the three officers, they were able to subdue the Defendant.

13.  Hawai'i Revised Statutes (HRS) § 710–1026(1) (1985) states:

A person commits the offense of resisting arrest if he [or she] intentionally prevents a peace officer acting under color of his [or her] official authority from effecting an arrest by:

(a) Using or threatening to use physical force against the peace officer or another; or

(b) Using any other means creating a substantial risk of causing bodily injury to the peace officer or another.

Although neither the indictment or judgment indicates whether subsection (a) was the subsection involved, that is not raised as error, and from the stipulated facts and the indictment, we assume Defendant was convicted by agreement of the parties for violating subsection (a) of HRS § 710–1026(1).

486

to resist an arrest made, as it was here, under color of law.

Accordingly, insofar as the indictment in Criminal No. 92–0025 related to the resisting arrest charge, we hold, consistent with the rationale underlying HRS § 710–1026, that the indictment cannot be treated as a "product or fruit" of any illegal seizure or arrest of Defendant.[14] The arrest of Defendant on the bench warrant was validly supported by at least Count III of the indictment. Hence, the search incident to Defendant's arrest on the bench warrant was not tainted by any illegal seizure or arrest of Defendant on January 22, 1992.

## C.

■ The facts stipulated to at trial indicate that "on January 24, 1992,[15] the Grand Jury returned an Indictment [in Criminal No. 92–0025] against the Defendant" for the drug offenses "and [for] Resisting Arrest." "[O]n January 31, 1992, . . . [three officers] executed a bench warrant [for Criminal No.] 92–0025(3) on the Defendant[.]" "Defendant was searched incident to his arrest[.]" The search resulted in the recovery of certain items, and "Defendant was again placed under arrest[,]" this time for drug offenses eventually charged under Criminal No. 92–0063.[16]

A search incident to arrest is limited in scope to "a protective search for weapons, or towards the discovery of the fruits of the crime for which the accused has been arrest-

ed, as well as the instrumentalities used in its commission, or to prevent the arrestee from escaping." *State v. Barnes,* 58 Haw. 333, 338, 568 P.2d 1207, 1211 (1977). Stipulation of fact number thirty-four of the trial stipulations indicates that items were seized from various parts of Defendant's clothing: "two (2) plastic syringes from the Defendant's left front trousers pocket, two (2) small plastic bags containing suspected black tar heroin from the Defendant's right rear trousers pocket, and three (3) pills, two (2) of which turned out to be Tylenol # 4, from the Defendant's right front coin pocket[.]"

The bags and pills could not have been mistaken, from their stipulated descriptions, for weapons or for instruments of escape. In addition, there was no reasonable basis to search for "the fruit of the crime for which the accused ha[d] been arrested" because the search here was incident to the execution of the bench warrant, not for any crime observed by the arresting officers. Although the plastic syringes, arguably, could have been mistaken for weapons, the charge relating to the syringes was dismissed "pursuant to a plea agreement." Therefore, we reverse the denial of the motion to suppress in Criminal No. 92–0063.

As the black tar heroin and pills were the only evidence supporting Defendant's conviction in Criminal No. 92–0063, we also reverse the judgment entered in Criminal No. 92–0063.

14. We need not and, therefore, do not decide whether an indictment can be dismissed as the "product or fruit" of a prior illegal seizure.

15. This is the date the grand jury indictment was signed. The indictment was filed on January 27, 1994.

16. The relevant stipulated facts state:

32. That on January 24, 1992, the Grand Jury returned an Indictment against the Defendant for Promoting a Dangerous Drug in the First Degree, Prohibited Acts Related to Drug Paraphernalia, and Resisting Arrest.

33. That on January 31, 1992, at approximately 1315 hours, Sergeant Richard Camara, Officer Mark Joaquin, and Officer Frank Gonzalez executed a bench warrant 92–0025(3) on the

Defendant at 339 Moi Place, Kihei [Kihei], Maui, Hawai'i [Hawai'i].

34. That the Defendant was searched incident to his arrest by Sergeant Richard Camara, and that search resulted in the recovery of two (2) plastic syringes from the Defendant's left front trousers pocket, two (2) small plastic bags containing suspected black tar heroin from the defendant's right rear trousers pocket, and three (3) pills, two (2) of which turned out to be Tylenol # 4, from the Defendant's right front coin pocket. The pills found in the Defendant's coin pocket were not contained in a prescription container nor did the Defendant have a prescription in his possession at the time of his arrest.

35. That the Defendant was again placed under arrest for Promoting a Dangerous Drug in the Third Degree, Prohibited Acts Related to Drug Paraphernalia, and Promoting a Harmful Drug in the Fourth Degree.

## V.

The August 5, 1992 Judgment in Criminal No. 92–0025 is reversed as to Count I and affirmed as to Count III, and the August 5, 1992 Judgment in Criminal No. 92–0063 is reversed.

BURNS, Chief Judge, concurring and dissenting.

I dissent from Parts II.D. and II.E. and a portion of Part II.G. In all other respects, I concur.

The relevant facts are as follows. Upon deplaning, the police subject a man to an unlawful investigative stop by stepping in front of him and stopping him. The police inform the man that they would be detaining his shoulder bag for canine screening for narcotics. The police ask the man for his ticket, his identification, and whether he has any drugs on him. The man states that he left his ticket on the plane and does not have any drugs on him, and gives the police his business card. The man tells the police that if they want his bag they can have it, hands the bag to the police, and then walks away toward the main terminal. The police take no action to stop him from walking away. Two police officers follow him at a distance. After making a phone call, the man asks the police why they are following him. The police do not answer. The man resumes his walk toward the main terminal. One police officer continues to follow the man and then hides behind a pillar while continuing to observe the man. The man arrives at the curbside, sits on a bench and, believing himself to be out of the view of the police, throws a white object into the planter of bushes directly behind him. The police officer arrests the man and then recovers the white object from the planter of bushes. Subsequent tests reveal that the white object contains black tar heroin.

The question is whether, when the man threw the white object into the planter of bushes, a reasonable person in the man's shoes would have believed that he was not free to leave. My answer is no.

The words and actions of the police communicated to the man that (a) they stopped him to obtain possession of his shoulder bag for canine screening for narcotics, (b) the stop was terminated when he handed them his shoulder bag, and (c) they would not stop him again unless and until the canine screening was positive or he provided them with cause to stop him.

The fact that the police did not stop the man when he walked away after handing them his shoulder bag communicated to him his freedom to leave. The surveillance of the man by the police at a distance did not communicate to him his lack of freedom to leave. It communicated to him his freedom to leave albeit under surveillance at a distance. Surveillance at a distance is not a seizure. The absence of a response from the police when the man asked them why they were following him communicated to him his freedom to leave. The factual situation that caused the man to believe that he was out of the view of the police communicated to him his freedom to leave. If the man believed that he would not be allowed to leave the airport until the police had completed their investigation to their satisfaction, his belief was unsupported by the facts and, therefore, unreasonable. The man knew that he was free to leave unless and until the canine screening was positive or he provided them with cause to stop him.

I conclude that the man was not seized when he abandoned the white object. Therefore, he has no standing to complain about the fact that the police recovered the white object and searched it. *State v. Mahone,* 67 Haw. 644, 701 P.2d 171 (1985). The unlawful arrest of the man by the police after he abandoned the white object but prior to their recovery and search of the white object does not give the man standing to complain about the recovery and search of the white object.

Accordingly, I would affirm the order denying the motion to suppress the two packets from the planter area and the August 5, 1992 judgment of conviction on Count I in Criminal No. 92–0025. In all other respects, I concur.